# Exhibit A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA - ATLANTA DIVISION

| | |
|---|---|
| MONIQUE MAYERS,<br><br>                   Plaintiff,<br><br> -against-<br><br>CURTIS JAMES JACKSON III, a/k/a "CURTIS JACKSON" a/k/a "50 CENT," a/k/a "FIF," a/k/a "FIFTY,"<br><br><br>                  Defendant. | Civil Action No.: 26-cv-02427-VMC<br><br><br>**[PROPOSED] AMENDED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## NATURE OF THE CASE

1. Curtis "50 Cent" Jackson once said: ***"The price of life is cheap. So, if you got the money, if you got the bag, it's gonna happen."*** In this case, those words were not mere conjecture. They were his mission statement.

2. Jackson ran his workplace the same way he built his public persona: through fear, humiliation, loyalty tests, and punishment. Money bought power. Power demanded obedience. Anyone who refused became a target.

3. Ms. Mayers refused. After twelve years inside Jackson's operations, she would not hide property in her own name to conceal Jackson's connection to a transaction during his bankruptcy-related reporting period. She would not file a false

1

police report accusing Jackson's driver/bodyguard, Bajar Walters AKA "Monster", of stealing Jackson's vehicle and approximately $600,000 in cash.

4.    Ms. Mayers would not lie to police. She would not frame another person. She would not risk federal charges or prison to protect Jackson's secrets.

5.    Jackson responded with retaliation. He fired her, caused Forbes to retract a career-defining feature about her, and unleashed a years-long intimidation campaign. Over the next six years, Ms. Mayers received more than 80 harassing and threatening calls and messages. Jackson also gave her personal phone number to people trying to reach him, turning her private life into another instrument of retaliation. The message was unmistakable: protect Jackson's secrets or to use Jackson's words: *suffer the* **consequences**.

6.    Jackson later gave Ms. Mayers' name to State authorities, including the FBI, as a background witness in matters involving alleged fraud and kickbacks connected to his ongoing litigation both civil and criminal involving his alcohol brand Sire Spirits. He apparently believed the FBI would *only* use her as a witness in the civil case. He was wrong.

7.    Years later, when Jackson learned that Ms. Mayers had been subpoenaed to testify before the Grand Jury, he lost control. A former insider was now under oath, beyond his reach, and able to expose what he had tried to bury. Within 24 hours of him finding out that she testified before the Grand Jury, his

2

retaliation escalated. Ms. Mayers received threatening communications, including the message: *"you will suffer fif."*

8.  Jackson then dragged the intimidation into a court-ordered deposition. While Jackson watched on Zoom, his attorney questioned Ms. Mayers about the unsolved 2006 murder of Israel Ramirez — an event irrelevant to the case, unrelated to Ms. Mayers, and one year before she worked for Jackson. That was not discovery. That was a warning.

9.  The campaign did not stop. On August 3, 2024, beginning before dawn, Ms. Mayers received fifteen calls in roughly three hours, including voicemails stating, "bang bang, I shot you down." Exactly one year later, she received fifteen more calls — same date, same count, same predawn timing. When Ms. Mayers reported the conduct in court, Judge Melissa Crane stated: "I mean, this has never happened in any case I've ever had."

10. This case is about power without accountability. Jackson demanded illegal favors because he believed people around him existed to serve his needs, protect his image, and absorb his risks. When Ms. Mayers rightfully refused, Jackson fired her. Then he used texts, calls, threats, and grotesquely outrageous deposition conduct to punish her, frighten her, and attempt to force her silence. This action seeks to hold him accountable for every act in that campaign, each of which constitutes a separate, actionable wrong, and all of which form part of a single

3

continuing pattern of retaliatory conduct that, as of the date of filing, has never stopped.

## PRELIMINARY STATEMENT

### *From Loyalty, to Refusal, to Retaliation*

11.   Ms. Mayers worked for Jackson from October 2007 through March 2019, twelve years. She assisted with his tax strategy, coordinated property acquisitions, processed artist payments, handled bankruptcy communications, and served as the operational backbone of G-Unit Records, G-Unit Touring, G-Unit Film & Television, and Sire Spirits. When Jackson eliminated his Vice President and Director of Operations in December 2015, Ms. Mayers absorbed both roles. She assisted with the disbursement strategy of Jackson's $10 million STARZ payment. She was trusted, loyal, and indispensable.

12.   That loyalty ended when Jackson ordered Ms. Mayers to participate in illegal conduct. In January 2019, Jackson directed Ms. Mayers to place property in her own name for Walters' mother, even though Jackson was funding and controlling the transaction. The purpose was obvious: keep Jackson's name off the asset, avoid another paper trail connecting him to Walters—whom Jackson had just wired $168,000 in December 2018—and conceal the transaction during Jackson's bankruptcy reporting obligations. Ms. Mayers refused.

4

13.     Jackson then escalated. On February 25, 2019, Jackson, through attorney Steve Savva, directed Ms. Mayers to file a police report falsely claiming that Walters had stolen Jackson's SUV.

14.     Ms. Mayers refused. Walters had permission to drive the vehicle. Filing that report would have required Ms. Mayers to falsely accuse Walters of a crime.

15.     Savva then called back with Jackson and private investigator Tom Rafferty on the line. Only then did the story change. Now, all three men claimed Walters had stolen approximately $600,000 and pressured Ms. Mayers to report the vehicle stolen because the money was supposedly connected to it.

16.     Ms. Mayers responded by first immediately raising Jackson's bankruptcy exposure, reminding the men that Jackson would need documentation showing the source of the $600,000 before making any report to law enforcement or the bankruptcy court. She then refused again. Ms. Mayers would not frame Walters, file a false police report, or risk her own liberty to protect Jackson's secrets.

17.     Jackson and Savva then instructed Ms. Mayers to terminate Walters without disclosing that Jackson was secretly listening on the call. Ms. Mayers refused to participate in that deception too.

18.     Shortly thereafter, on March 27, 2019, Jackson terminated her without cause and without severance.

## *Jackson First Attacks Ms. Mayers' Reputation*

19.    After Jackson terminated Ms. Mayers, he did not simply walk away. He moved to destroy her credibility, reputation, and future earning power.

20.    Jackson weaponized his attorneys to shut down a Forbes profile of Ms. Mayers' career by leveling knowingly false accusations of embellishment. The purpose was plain: kill a positive public profile, poison her name in the entertainment industry, and make future employers afraid to hire her.

21.    The result was devastating. Despite twelve years of senior operational experience, Ms. Mayers has been effectively blocked from obtaining employment commensurate with her experience.

## *The Harassing Calls and Texts Begin*

22.    After attacking Ms. Mayers' reputation, Jackson's intimidation campaign moved to her phone. From January 2020 through March 2026, Ms. Mayers documented more than eighty-three incidents of harassment involving at least twenty-five unique phone numbers from California, Texas, Georgia, New York, and, in one instance, Tanzania.

23.    Because Jackson invaded her privacy by recklessly distributing her number, strangers called and texted at all hours asking for "Curtis," "50," "Curtis James Jackson the 3rd," and "fif." The calls were not random. They were designed

6

to make Ms. Mayers feel watched, exposed, and reachable by anyone in Jackson's orbit or random people he came into contact with.

24.    Direct evidence later confirmed Jackson's role. On September 1, 2023, Victor Sena texted Ms. Mayers and confirmed that "50 gave him [Ms. Mayers'] number in passing in San Diego at the Parq" to get tickets to Jackson's show.

25.    When Ms. Mayers called another number back, two men told her, "50 Cent owed them 100k... for some girls" and explained "[Fifty] had called [them] from [Ms. Mayers'] number a year ago." These confirmations were not speculation. They were direct evidence that Jackson personally distributed Ms. Mayers' phone number.

## *Jackson's Intimidation Escalates Around Sworn Testimony*

26.    The harassment escalated when Ms. Mayers became a witness in proceedings involving Jackson and Sire Spirits. In 2021, Jackson provided Ms. Mayers' name to the FBI as a former employee and potential background witness in connection with the criminal investigation involving Mitchell Green.

27.    In 2024, days before Ms. Mayers was scheduled to give sworn testimony under subpoena in the civil Sire Spirits fraud case, Jackson learned that Ms. Mayers had not only spoken with the FBI, again because Jackson had identified

7

her as a former employee, in 2021, but the U.S. Attorney's office had also subpoenaed Ms. Mayers to testify before the Grand Jury.

28.    Jackson's paranoia and need for control overtook the obvious fact that he had created the very risk he now feared. He had provided Ms. Mayers' name to the FBI to assist in the Sire case. But once he learned that her involvement had gone beyond an interview—and that she had been subpoenaed to testify before the Grand Jury—he intensified his threats. On the afternoon of May 1, 2024—the eve of her court-ordered deposition in the civil case—Ms. Mayers received a threatening text message: "you will suffer fif." "Fif" is Jackson's well-known nickname.

29.    But that wasn't enough. The next day, on May 2, 2024, Jackson's intimidation moved from the shadows into a court-ordered deposition.

30.    With Jackson silently watching on Zoom, his attorney Eamon O'Kelly ("O'Kelly") of Blank Rome LLP peppered her with questions concerning Ms. Mayers' conversations with the FBI and the U.S. Attorney's Office—matters outside the proper scope of the deposition. After Ms. Mayers answered yes, O'Kelly pressed for and asked whether agents had asked about Jackson or his attorney, Stephen Savva.

31.    Ms. Mayers answered "No" as to Jackson and "I don't recall" as to Savva. O'Kelly kept pressing anyway.

32.    Immediately after exhausting the FBI inquiry, and at Jackson's direction, O'Kelly pivoted to an inflammatory and wholly unrelated subject: the unsolved 2006 murder of Israel Ramirez at a Busta Rhymes video shoot in Brooklyn.

33.    O'Kelly asked Ms. Mayers directly: "Do you know who shot and killed Israel Ramirez in Brooklyn at a Busta Rhymes video shoot?"

34.    The Ramirez murder had nothing to do with the civil case. It had nothing to do with Ms. Mayers. She had no knowledge of it, no involvement in it, and was not even working for Jackson in 2006.

35.    Jackson did not have his attorney invoke the Ramirez cold case into the deposition to uncover any truth but to send a threat and terrorize Ms. Mayers into silence by reminding her that disclosing too much to State authorities or exposing secrets he wanted buried came with consequences.

### *The "Bang Bang" Calls and Court Intervention*

36.    And the threats did not end at the deposition. On August 3, 2024, at 4:29 a.m., Ms. Mayers received the first of fifteen phone calls that continued for three hours.

37.    Two voicemails sang: "bang bang, I shot you down."

9

38.    After the "bang bang, I shot you down" voicemails, Ms. Mayers reported Jackson's conduct to the Court, including its connection to Jackson and the deposition questioning about the Ramirez murder.

39.    State Judge Melissa Crane reacted with alarm. On the record, Judge Crane stated: "I mean, this has never happened in any case I've ever had."

40.    Judge Crane then told Ms. Mayers: "In terms of your safety, I'm going to pass all this along to our Court Officers. I've elevated this."

41.    Despite Ms. Mayers elevating Jackson's conduct to a state judge, the harassment did not stop. Exactly one year later, on August 3, 2025, Ms. Mayers again received fifteen calls. Same date. Same number of calls. Same pre-dawn pattern. And the harassment has not stopped.

42.    As of the filing of this Complaint, the harassment remains active and ongoing.

43.    On April 28, 2026, mere days before the filing of this Complaint, another unidentified caller contacted Ms. Mayers looking to speak with "50."

## Jackson's Pattern of Retaliation

44.    Jackson's conduct toward Ms. Mayers fits his well-documented public pattern of punishing anyone he believes crossed him. Jackson has built a public

10

persona around prolonged feuds, social media attacks, and sustained campaigns against former associates.

45. In a widely reported Instagram post, Jackson stated: "anyone who chooses to go against the grain will suffer."

46. For Ms. Mayers, that was not rhetoric. It was a threat made real. Jackson demanded loyalty while asking her to commit fraud. When she refused, he terminated her. When she tried to rebuild her career, he smeared her. When she became a witness, he threatened her. When she cooperated with State authorities, he used a deposition to intimidate her. When she reported him, the calls continued.

47. This action seeks compensatory damages for severe emotional distress and punitive damages sufficient to deter Jackson—and others with similar wealth, celebrity, and power—from weaponizing their resources to terrorize former employees who refuse to commit fraud or cooperate with law enforcement.

48. Each harassing act alleged herein constitutes a separate, independently actionable wrong and a fresh accrual under the continuing violation doctrine. Together, they form a single, unbroken course of retaliatory conduct that began when Ms. Mayers refused Jackson's illegal demands that has never stopped.

## PARTIES

49. Plaintiff Monique Mayers is a ~~resident~~ citizen of the State of Georgia.

11

50.     Upon information and belief, Defendant Curtis James Jackson III ("Defendant" or "Jackson") is a ~~resident~~ citizen of the state of Texas. Defendant is a well-known rapper, actor, producer, and businessman who uses the stage name "50 Cent" and is also referred to as "Fif," "Fifty," and other variations. Defendant owns and operates multiple business entities including G-Unit Records, G-Unit Touring, G-Unit Film & Television, and has ownership interests in spirits companies including Sire Spirits, LLC.

## JURISDICTION AND VENUE

51.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the parties and the amount in controversy substantially exceeds $75,000, exclusive of interest and costs. Plaintiff's damages include: past and future severe emotional distress and psychological injury requiring psychotropic medication; physical injury manifesting as elevated blood pressure requiring urgent care and specialist referral; lost professional income and career advancement resulting from the destruction of a Forbes profile and the circulation of a false termination narrative throughout the entertainment industry that has chilled prospective employers from hiring her; unpaid severance promised on the termination call; the cost of legal counsel retained twice in connection with proceedings arising from Defendant's own business disputes; and punitive damages warranted by Defendant's deliberate, sustained, and

escalating campaign of harassment over more than six years. These damages, individually and in combination, substantially exceed the jurisdictional threshold.

52.    This Court has personal jurisdiction over Defendant pursuant to Georgia's long-arm statute and the Due Process Clause of the Fourteenth Amendment because Defendant has sufficient minimum contacts with the State of Georgia and has purposefully availed himself of the privilege of conducting activities within Georgia. Specifically, Defendant directed a sustained campaign of tortious harassment targeting Plaintiff, a Georgia resident, by: causing threatening text messages to be sent to Plaintiff's Georgia phone number; orchestrating harassing phone calls received by Plaintiff at her Georgia residence; personally distributing Plaintiff's Georgia phone number at public events to individuals who subsequently called Plaintiff in Georgia; directing his agents to threaten Plaintiff and her family; and causing predawn calls with gun-violence voicemails to be delivered to Plaintiff in Georgia on August 3, 2024 and August 3, 2025. Each of these acts was purposefully directed at a Georgia resident and caused harm in Georgia. Defendant knew Plaintiff resided in Georgia. This Court's exercise of personal jurisdiction over Defendant is consistent with traditional notions of fair play and substantial justice.

53.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district, specifically in Douglas county including Defendant's

harassment campaign directed at Plaintiff's residence in Georgia, and the filing of two police reports with the Sheriff's Office.

54.    The claims asserted herein are timely under Georgia's applicable limitations period. Each act of harassment alleged herein constitutes a separate, independently actionable tort. Defendant's campaign of harassment is a continuing violation: a single, unbroken course of intentional tortious conduct that has continued without interruption from 2019 through the filing of this Complaint. The most recent documented act occurred on April 28, 2026—within the limitations period applicable to both claims asserted herein. Under the continuing violation doctrine, the limitations period runs from the date of the last act in the series. Because the campaign has never stopped—and was ongoing as of the filing date—all acts in the continuing pattern are actionable. In the alternative, even if any individual act is considered independently, the acts occurring within the two years preceding filing are independently actionable, and the full pattern of conduct is admissible as evidence of those timely acts.

## FACTUAL BACKGROUND

### *The Twelve Years of Loyalty (2007-2019)*

55.    From October 2007 through March 2019, Monique Mayers served as Curtis James Jackson III's most trusted operational coordinator and financial

administrator. She was not merely an assistant. She was the operational backbone of Jackson's entertainment empire.

56.    Ms. Mayers assisted in managing and coordinating Jackson's tax strategy, property acquisitions, artist payments, bankruptcy communications, and the day-to-day operations of G-Unit Records, G-Unit Touring, G-Unit Film & Television, and Sire Spirits, LLC. She coordinated with Jackson's accountants, attorneys, business managers, and financial advisors. She processed millions of dollars in transactions at Jackson's direction. She was entrusted with confidential financial information that Jackson limited to those he trusted most.

57.    The scope of her authority was extensive. Jackson directed Ms. Mayers via text to approve payments, book flights, coordinate filming schedules, manage payments to artists, meet with attorneys and accountants, handle property transactions, manage bankruptcy communications, coordinate EFFEN Vodka promotional events, and process financial transactions across his business portfolio. She processed payment requests including $52,000 for Jay Cardiello's divorce, $70,000 for a Rotimi radio promotion, and $30,000 in cash for digital and marketing—each approved by Jackson. Ms. Mayers was not a peripheral employee. She was an integral part of Jackson's operation.

58.    In December 2015, Jackson eliminated his Vice President and Director of Operations and never replaced them. Ms. Mayers absorbed both roles in addition

15

to her own duties, performing the work of three senior executives for more than three years. She did not complain, nor did she demand additional compensation commensurate with the expanded responsibilities.

59.    In December 2018, Jackson received a $10 million payment from STARZ for his work on the television series *Power*. A conference call was held involving Jackson's accountant and senior staff to discuss his tax exposure and how the monies should be disbursed in light of his ongoing bankruptcy-related reporting obligations.

60.    As a result of that meeting and at Jackson's direction, Ms. Mayers coordinated the disbursement strategy, which included wiring $168,000.00 to Jackson's driver and bodyguard, Bajar Walters ("Walters")—who at that time was part of Jackson's inner circle.

61.    Jackson trusted Ms. Mayers with everything because for twelve years, she executed his directives without question, without disclosure, and without defiance—until Jackson crossed the line.

**_The Three Refusals That Changed Everything (January-February 2019)_**

i.    *The Property Scheme*

62.    In January 2019, Jackson devised a plan to purchase a home for Walters' mother. Because Jackson remained subject to ongoing bankruptcy-related reporting obligations and could not place new assets in his own name without

16

disclosure, he instructed Walters to ask Ms. Mayers to place the prospective home in her own name.

63. Ms. Mayers first confirmed the request directly with Jackson and then refused.

64. Rather than just declining, Ms. Mayers consulted Jackson's accountants at Boulevard Management to find a lawful path forward. On January 11, 2019, she emailed Todd Bozick ("Bozick") and Lynda Burton on Jackson's behalf: "50 would like to help Bajar Walter buy a townhouse in NC. Bajar will take care of the down payment but 50 would like to secure the mortgage under an entity for him." Bozick replied noting "a couple of issues that may make this tricky, including the outstanding bankruptcy."

65. On January 14, 2019, Ms. Mayers texted Jackson directly: "Checked with the accountant and u wouldn't be able to do anything for the house through the foundation." She then forwarded the accountant's advice to Walters and suggested Walters use the funds from the recent $168,000 wire as a down payment—a lawful alternative to the scheme Jackson had proposed.

66. For a man who had never heard "no" from Ms. Mayers in twelve years, her refusal to facilitate bankruptcy fraud was strike one.

### ii.    *The False Police Report*

67.    On February 25, 2019, Jackson, his attorney Stephen Savva ("Savva"), and private investigator Tom Rafferty ("Rafferty") called Ms. Mayers and instructed her to file a police report claiming that Walters had stolen Jackson's vehicle. During that first call, they did not explain why they wanted the report filed. They simply directed Ms. Mayers to make the report.

68.    Jackson, Savva, and Rafferty then called back. During the second call, the story changed. Only then did they claim that Jackson believed Walters had stolen approximately $600,000 in cash from Jackson's apartment and that Ms. Mayers should report the vehicle stolen so police could stop Walters and search for it.

69.    Ms. Mayers immediately identified the problem: "Gentlemen, I will remind you that there are reports being sent to the bankruptcy court. So, unless there's a paper trail"—making clear that reporting $600,000 in cash as stolen would expose an asset Jackson had never disclosed to the bankruptcy court.

70.    Rafferty agreed. On the call, he advised Jackson that filing a police report would be inadvisable because Jackson could not account for the origin of the cash in light of his bankruptcy reporting obligations. The call ended.

71.    Jackson and Savva called Ms. Mayers back and pressed her again. Ms. Mayers refused. She told Savva directly: she would not report a car stolen when, in fact, it was not stolen. That was strike two.

18

72.    The connection between the two refusals was clear. Jackson had first tried to use Ms. Mayers to hide an asset acquisition from the bankruptcy court. He then tried to use her to conceal $600,000 in undisclosed cash from the same court. In both instances, he asked her to carry the legal exposure for his conduct. In both instances, she refused.

### iii.    *The Termination of Walters*

73.    Jackson's desire to fire Walters had an obvious driver: he believed Walters had stolen the $600,000, and he wanted him gone. But Jackson had no intention of making that accusation openly. Jackson and Savva called Ms. Mayers back and instructed her to call Walters, inform him he was fired, and—critically—not let Walters know that Jackson was on the line listening. Jackson wanted to dismiss the man he was accusing of stealing $600,000 from him without letting that man know who was on the call. Ms. Mayers refused to be used in this manner. She called Walters, told him Savva was on the line, and let him take over the call. As Ms. Mayers later stated: "There were too many inconsistencies and allegations being thrown around and I did not want to be tied up in any of it." Savva then told Walters directly, as Jackson quietly listened, not wanting to confront Walters directly, that he was fired and requested Walters bring the keys to the SUV to the G-Unit office. Walters complied. And for Ms. Mayers, that was strike three.

74.    In a single day, Jackson had asked Ms. Mayers to file a false police report for a car that was not stolen, be an accomplice in concealing $600,000 in undisclosed cash from a state court, and fire Walters for the alleged theft while Jackson listened from the shadows. In every instance, Jackson wanted someone else to stand between him and his illegal conduct or enable his feckless conduct. In every instance, Ms. Mayers refused.

75.    After Jackson terminated Walters, as Savva and Rafferty continued to search for someone—anyone—to pin the missing $600,000 on, Ms. Mayers' workplace became increasingly toxic. They demanded her phone records, which she freely provided. Then they pushed further, demanding phone records that included the numbers of her family members. Ms. Mayers drew the line. Given Jackson's history of harassment and intimidation, she had no interest in exposing her family— especially her children—to his brand of toxicity.

76.    In response to Ms. Mayers' refusal to disclose her family members' phone records Jackson's investigator threatened ***"if we want your families phone numbers, we can get them,"***

77.    The pressure took a physical toll. Ms. Mayers began suffering persistent headaches throughout the day and went to urgent care. Although she had no history of high blood pressure, urgent care diagnosed her with elevated blood pressure, gave

20

her a work note, and instructed her to rest. Ms. Mayers informed Jackson. He reacted with indifference.

78.    She was then referred to a specialist the following day. Her physician confirmed her pressure was higher on March 19 than the night before and directly asked whether her job was stressful.

79.    Interestingly enough, within the same time frame, Savva and Rafferty changed targets again. Like Keystone Cops desperate for a culprit for the supposedly stolen $600,000.00, they began looking at the superintendent of Jackson's building and his wife.

80.    On March 27, 2019, Jackson terminated Ms. Mayers after she worked for him for well over a decade without providing a reason. Ms. Mayers put her keys on her desk and left. Although Jackson promised severance he never paid it.

### *Jackson's Attempt to Reclaim Ms. Mayers — and Her Final Refusal*

81.    In the weeks following her termination, Jackson sent George Bishop ("Bishop")—a childhood friend and Jackson's head of security at the Connecticut mansion—to Ms. Mayers' home. Bishop delivered what appeared to be a message from Jackson: Jackson "cared about" Ms. Mayers and wanted to meet with her. Ms. Mayers refused. She made it clear to Bishop that she had no desire to meet with Jackson or return to work for him. She was done. Jackson had a choice after Ms.

21

Mayers declined: accept her decision and move on or punish her for it. He chose punishment.

### *The Forbes Silencing (June 2019)*

82.    In June 2019—less than three months after her termination—Forbes published a profile of Ms. Mayers' career and her new company. The same day, Jackson's attorney at Jackson's behest and in an act of sheer pettiness, sent a letter demanding removal, falsely alleging embellishment and asserting the existence of a non-disclosure agreement that Jackson has never produced. Forbes removed the article.

83.    The targeted nature of the Forbes suppression was confirmed at the May 2024 deposition. As Ms. Mayers testified under oath: there was another person with a connection to Jackson who had a Billboard article published at the same time as her Forbes profile. His remained. Hers did not. Jackson did not apply a uniform policy. He applied targeted retaliation against the one employee who had refused him three times.

84.    The professional consequences have been severe, enduring, and ongoing through the filing of this Complaint. Jackson's refusal to provide references—and his reputation for intimidation, trolling and retribution in the industry—has effectively blocked Ms. Mayers from obtaining employment commensurate with her nearly twelve years of senior operational experience.

85.     Upon information and belief, on several occasions when prospective employers in the entertainment industry have inquired about Ms. Mayers, they have been met not only with silence from Jackson's camp but with the understanding— informed by Jackson's well-documented public pattern of retaliating against those he views as disloyal—that hiring her carries risk.

86.     Jackson commands significant influence in the entertainment industry. Employers who have seen what he does to people who cross him have reason to be wary.

### The Harassment Campaign

87.     Getting the Forbes article pulled down was just the beginning. Ms. Mayers started receiving calls at all hours that in many instances directly referenced Jackson. After the pattern became clear, she began documenting the calls.

88.      After Jackson terminated her employment Ms. Mayers began routinely receiving harassing text messages, voicemails and phone calls. Something that rarely ever happened prior to her termination. Ms. Mayers has documented over eighty-three incidents of harassment involving at least twenty-five unique phone numbers from California, Texas, Georgia, New York, and in one instance Tanzania. Strangers called at all hours asking for "Curtis," "50," "Curtis James Jackson the 3rd," and "fif."

23

89.     The pattern was consistent across years and geography: strangers calling at all hours using Jackson's legal name, stage name, and various nicknames, from multiple states and countries—demonstrating repeated, systematic distribution of Ms. Mayers' phone number to different individuals across different locations over an extended period of time.

90.     Ms. Mayers suspected from the beginning that Jackson was orchestrating the harassment. The evidence was substantial—but for years, Ms. Mayers was too afraid to publicly name him. She documented the incidents instead.

91.     Each of the following incidents constitutes a separate, actionable intrusion upon Ms. Mayers' privacy and a separate act in the continuing campaign of harassment directed at her by Defendant Jackson:

    a.     On January 7, 2020, a female called repeatedly asking to "Speak with 50" and on each occasion Ms. Mayers would respond "you have the wrong number." After the third call, the female caller became irritated and used vulgar language directed at Ms. Mayers. The female caller then called again from an unblocked number.

    b.     On February 20, 2021, approximately 9:00 p.m.—several days after receiving a subpoena to testify before the grand jury and around the time because 50 gave her name to the FBI Ms. Mayers was interviewed by the FBI on a case involving Jackson—Ms. Mayers

received a call from a man who said "Fiddy...Fiddy" and then hung up.

c.    On June 13, 2023, at 8:53 p.m. and then at 8:55 p.m., Ms. Mayers received calls from a man who identified himself as just "Demetrius" (Caller ID said Jonathan Monta) trying to reach Curtis. When she told him he had the wrong number he insisted, asking "are you saying this is not Curtis James Jackson the third." When Ms. Mayers repeatedly said no, he kept insisting before ending the call.

d.    On September 1, 2023, at 7:39 a.m., Victor Sena texted Ms. Mayers confirming that "50 gave him" Ms. Mayers' number "in passing in San Diego at the Parq" to get him tickets to his show. Jackson personally handed Ms. Mayers' phone number to a stranger at a public event. Sena's text confirmed what Ms. Mayers had long suspected: Jackson was distributing her number to people in his orbit, whether they understood his purpose or not.





e.    That same evening—September 1, 2023, at approximately 8:59 p.m.—Ms. Mayers received a call from 212-365-8626 from a man who identified himself as calling from "Mehran's Steakhouse" in New York regarding a reservation for Jackson. Ms. Mayers informed the caller he had the wrong number. The caller called back and asked if she was sure, stating that her number was on file for a recent reservation made on Jackson's behalf. Ms. Mayers recorded the call. Mehran's Steakhouse was a fictitious restaurant—a widely publicized fake Google Maps listing at a residential address on the Upper East Side of Manhattan, with no kitchen, no dining room, no staff, and no ability to accept reservations. The call was not a from a real business. It was a fabricated pretext to contact Ms. Mayers using Jackson's name, placed on the very same day Victor Sena confirmed Jackson had been personally distributing her phone number to strangers.

f.    On September 3, 2023, she received a series of text messages from an individual looking to speak with "Curtis."

g.    On February 13, 2024—the very day Ms. Mayers was served with a witness subpoena to appear for deposition in the Sire Spirits civil litigation—a caller identifying as "Ja Rule" called at 1:00 a.m.

28

asking for "Curtis." Ja Rule is a well-known rapper engaged in a decades-long public feud with Jackson. The use of his name on the same day the subpoena was served was not coincidental. As Ms. Mayers later told Judge Crane directly: "Ja Rule has never called my number in the history of anything, so these calls for me to be having five years after the fact are not coincidental in my opinion based on what I know."



h.      On March 6, 2024, she received a call at 12:50 a.m. from a barely intelligible male caller repeatedly requesting to speak with "Curtis."

i.      On August 13, 2024, at 11:17 a.m., Ms. Mayers received a missed call from a number that displayed the caller ID "Nadiyah Boyd"—the mother of Tony Yayo's daughter. Tony Yayo is 50 Cent's longtime hype man and G-Unit performer. When Ms. Mayers called the number back, a woman answered and denied having called Ms. Mayers—a denial consistent with Jackson's pattern of using intermediaries to make contact while remaining in the background.

j.      On October 29, 2024, within a span of forty-two minutes—from 3:41 p.m. to 4:23 p.m.—Ms. Mayers received eight calls from four different phone numbers in four different states: Nevada, Florida, New Jersey, and California. The coordination required to generate eight calls from four different numbers across four states within forty-two minutes is not consistent with random misdials. It is consistent with the deliberate distribution of Ms. Mayers' phone number to multiple parties with instructions to call.

k.      On March 15, 2026—less than two months before the filing of this Complaint—Ms. Mayers received an unsolicited text from an unknown number from someone seeking Tony Yayo, Jackson's

30

longtime hype man and G-Unit performer. Ms. Mayers has no relationship with Tony Yayo. She has no reason to receive messages intended for him. She has no connection to him except through Jackson. Whether Jackson personally distributed her number to this individual or whether it reached him through the network Jackson has long maintained and deployed against her, the result is the same: Jackson's world was once again forced into Ms. Mayers' life uninvited, unwanted, and without legitimate purpose.

92.    The incidents described above are representative, not exhaustive. The harassing calls also came from unknown numbers, strangers asking for "Curtis" or "50," and voicemails and text messages that referenced Jackson—at all hours of the night and morning. The calls began only after Ms. Mayers' employment with Jackson ended and escalated each time Jackson became aware of her participation in legal proceedings. Each new harassing contact is a separate, independently actionable wrong, and all form part of a single continuous course of tortious conduct.

### *State Testimony and Escalating Threats (2021)*

93.    On February 18, 2021, a State grand jury subpoena commanded Ms. Mayers to appear and testify in the criminal case against Mitchell Green arising from allegations made by Jackson regarding fraud at Sire Spirits. Around the same time, FBI Special Agent Victor Hernandez and another agent visited Ms. Mayers' home

31

in New York. The agents told her she was not in trouble and acknowledged her treatment at Jackson's hands: "we know he didn't do right by you." Two days after the subpoena, on February 20, 2021, she received a call in which a man repeatedly said "Fiddy...Fiddy"—then hung up.

94.    On March 29, 2021, Ms. Mayers provided State grand jury testimony pursuant to the subpoena. Jackson did not yet know she had testified. That would soon change.

### *The May 2, 2024, Deposition*

95.    In the days leading up to the May 2, 2024, deposition, Jackson's legal team learned for the first time that Ms. Mayers had given prior testimony—testimony they had not known about and could not account for. Jackson immediately suspected that Ms. Mayers was cooperating with State authorities.

96.    The manner in which Jackson learned about the prior testimony is telling. On April 23, 2024, Diana Sterk, Esq. ("Sterk"), counsel for Michael Caruso in the Sire Spirits litigation, spoke by telephone with Ms. Mayers' attorney, Marvin Arrington, Esq., to discuss the scope of the upcoming deposition. During that call, Sterk asked whether Ms. Mayers had ever been asked to testify in a prior proceeding and whether a transcript existed from any such testimony. Sterk stated she was not previously aware that Ms. Mayers had given testimony. Arrington confirmed that Ms. Mayers had previously testified and that a transcript may exist. Sterk indicated

32

she would inquire with the opposing parties—including Jackson's counsel—to determine whether they possessed a copy.

97.    One week later, on April 30, 2024—two days before the deposition—Reena Jain, Esq. ("Jain") of Blank Rome LLP, counsel for Jackson and his entities, called Arrington directly. Jain stated she wanted to speak with him "in advance of speaking with your client" and raised the issue of attorney-client privilege arising from Ms. Mayers' tenure at G-Unit Records. During that conversation, Arrington disclosed that Ms. Mayers had given testimony in a prior proceeding and that she had been required to retain and pay for legal counsel on two separate occasions in connection with legal matters involving Jackson.

98.    Jain's reaction was immediate and revealing. She stated: "I was the attorney of record in the previous litigation you're referring to. I know who was deposed, and she wasn't one of them." The inescapable conclusion was that Ms. Mayers had given testimony in a separate proceeding—one that Jackson's legal team had no knowledge of and no visibility into.

99.    Upon information and belief, Jackson's counsel immediately relayed this discovery to Jackson. Jackson knew Ms. Mayers had given sworn testimony his lawyers could not identify or account for. He reacted within twenty-four hours.

100.    On May 1, 2024—one day before Ms. Mayers was scheduled to be deposed as a witness in *Sire Spirits, LLC v. Beam Suntory, Inc., et al.*, Index No.

33

654737/2023—she received a text message at approximately 3:24 p.m.: *"You will suffer fif."*



101.   The timing—less than twenty-four hours after Jackson's counsel discovered Ms. Mayers had given unaccounted-for testimony, and the night before her deposition—was not coincidental. The message used Jackson's own well-known nickname. Its meaning was explicit.

102. Jackson's own public statements track the same language. In a widely reported Instagram post, Jackson stated: "I am the algorithm anyone who chooses to go against the grain will suffer."



103.   Before a single question was asked on May 2, 2024, Ms. Mayers'

attorney Marvin Arrington placed on the record that Ms. Mayers had "received two

threatening text messages yesterday, the day before this deposition," and stated: "that leads me to believe that it's one of your clients that are sending her the threatening text messages." Arrington identified the source as "one of the parties in the deposition. Specifically. your client, the owner of the companies that you represent"—meaning Jackson. Arrington further stated that Ms. Mayers had "already been in contact with the police and will be going there today at the conclusion of this deposition in order to physically file a report." That contemporaneous, on-the-record statement—made in the presence of all counsel before testimony even began—constitutes independent corroboration of the pre-deposition threat.

104.    Ms. Mayers was then deposed. Jackson and his attorney O'Kelly appeared via Zoom for the deposition. Also present on the Zoom were Jackson's attorney Stephen Savva, Esq. and Tim Degnan, Esq.

105.    Jackson's presence at a third-party witness' deposition was notable. He sat silently, watching, as his counsel questioned Ms. Mayers.

106.    The questioning began with routine topics related to the underlying litigation. Then, referencing the April 30, 2024, call among counsel, O'Kelly stated that he understood Ms. Mayers had previously given testimony in another proceeding and launched an inquiry demanding to know whether Ms. Mayers had

spoken with the FBI and the U.S. Attorney's Office—matters entirely outside the scope of the deposition and irrelevant to the case.

107. After Ms. Mayers answered yes, O'Kelly pressed relentlessly, forcing her to provide specific details about the FBI interview—when it occurred, how long it lasted, which office conducted it, and whether agents asked about Jackson or his attorney, Savva. Ms. Mayers answered "No" as to Jackson and "I don't recall" as to Savva. That did not stop him. O'Kelly continued, driving the questioning well beyond any legitimate boundary and using the deposition as a vehicle to pressure a state witness.

108. Then, almost immediately after exhausting the FBI inquiry, O'Kelly escalated. He pivoted to an entirely unrelated and inflammatory subject—the unsolved 2006 murder of Israel Ramirez at a Busta Rhymes video shoot in Brooklyn, an incident involving G-Unit affiliates, including Jackson.

109. O'Kelly posed the question directly: "Do you know who shot and killed Israel Ramirez in Brooklyn at a Busta Rhymes video shoot?" This question was improper—irrelevant, inflammatory, and serving no legitimate evidentiary purpose.

110. Attorney for Michael Caruso, Sterk, objected immediately: "That is so far outside of this case it just seems like at this point you're harassing the witness."

111. The murder question had no place in that deposition. It bore no connection to the Sire Spirits litigation, no relevance to any legitimate line of

38

inquiry, and no relation to any fact Ms. Mayers could provide. She was not even working for Jackson in 2006. She had no knowledge of the incident, no involvement in it, and no information relevant to any claim or defense. As Ms. Mayers testified directly: "I was at the business management firm in 2006. So, you're asking the wrong person."

112.   The Ramirez murder is not a forgotten historical footnote. Former NYPD detective Derrick Parker—known as "The Hip Hop Cop"—has confirmed publicly that the case remains stalemated for decades because "high profile rappers were involved in the dispute where a person got shot" and that those individuals would have to be brought into court and that prosecution would require the State government. Rapper Rah Digga, who was also present at the shoot, stated in a 2019 interview that the murder occurred shortly after G-Unit arrived on the scene. Jackson, through his attorney O'Kelly, was not invoking a random cold case. He was invoking an open, unresolved case in which his own presence at the moment of the killing has never been fully examined—and where everyone with knowledge has, for nearly two decades, remained silent. The message to Ms. Mayers was plain: I know you cooperated with State authorities, and ***"I am going to remind you of an unsolved murder where G-Unit was present so you should understand what happens to people who talk."***

39

### *Ms. Mayers Breaks Her Silence (June 2024)*

113.    The questioning about the still-unsolved murder of Israel Ramirez broke Ms. Mayers' silence regarding the years of harassment. For years, Ms. Mayers had suspected Jackson was behind the harassing phone calls, voicemails and text messages but had been too afraid to publicly name him. The questioning was so plainly designed to intimidate rather than elicit evidence, and so far outside the bounds of legitimate legal inquiry, that Ms. Mayers realized silence was no longer protecting her.

114.    On June 10, 2024—one month after the deposition—Ms. Mayers contacted FBI Special Agent Victor Hernandez. She told Agent Hernandez: "I am growing increasingly scared for my safety as well as my family, considering Jackson now knows I have spoken with the FBI, and the US attorney's office." For the first time, Ms. Mayers went on the record and explicitly identified Curtis James Jackson III as the person she believed was behind the years of harassing phone calls, text messages, and the distribution of her phone number to strangers.

115.    Ms. Mayers also filed a Police Report at the Sheriff's Office, where an officer took her complaint and documented in a police report that Ms. Mayers reported receiving the text "you will suffer fif" from (305) 449-5792 on May 1, 2024—the day before her deposition—and that she had been receiving phone calls and texts since 2019. Officer Roberson further documented that Ms. Mayers reported

receiving a text in which "that person said 50 is giving out her number for people to call and text."

116.   Coming forward did not stop the harassment. It intensified it.

### *The August 3rd 2024, Barrage*

117.   Approximately two months after contacting the FBI and naming Jackson as responsible, on August 3, 2024, at 4:29 a.m., an unknown caller placed fifteen consecutive phone calls to Ms. Mayers. The calls continued through 7:27 a.m.—three hours of calls in the predawn darkness.

118.   Two voicemails were left. The caller sang lyrics: "bang bang, I shot you down."

119.   Ms. Mayers immediately went to the Sheriff's Office and filed another Police Report. The officer who took the report personally verified the call amounts, times, and voicemail content on Ms. Mayers' phone.  The officer observed and documented that Ms. Mayers was visibly and acutely distressed during the filing of the report. That observation was accurate and consistent with what Ms. Mayers had just experienced: fifteen calls beginning at 4:29 in the morning, two voicemails singing "bang bang, I shot you down"—the latest escalation in a years-long campaign of harassment that compelled her to contact the FBI twice, and made her afraid to disclose where she worked. The distress the officer observed was the visible result of a deliberate and sustained campaign of intimidation.

41

120.  Days after receiving the death threat voicemails, Ms. Mayers sought mental health treatment for the first time in her life. On or about August 5, 2024, she began therapy with a licensed professional counselor in Georgia, presenting with overwhelming anxiety and what she described as the daily burden of deflecting harassing phone calls. She had no prior mental health history. The harm was new because Jackson had created it.

### *Ms. Mayers Reports to Judge Crane (September 2024)*

121.  Although still frightened, Ms. Mayers was determined to create a formal record. On September 16, 2024, at a subsequent court conference in the Sire Spirits civil action, she reported the harassment campaign to the presiding Judge, Melissa Crane, and identified Jackson by name as the person responsible.

122.  Ms. Mayers told Judge Crane about the murder questioning at her deposition: "I didn't even work for Mr. Jackson when the murder that the lawyer asked me about occurred. That's one. Two, I was kind of confused at why this lawyer would be asking me about a murder because who asked him to ask me that. That's what I wanted to know, who asked him to ask me that and why would Mr. Jackson be inquiring about that."

123.  Ms. Mayers continued: "I'm extremely uncomfortable with all of these crazy phone calls that I'm getting, it's extremely uncomfortable." When Judge Crane

asked about her safety concerns, Ms. Mayers stated: "I want to make sure that I'm safe at this point because I don't feel safe at all."

124.    Ms. Mayers testified: "I feel like these messages are coming by way of someone on Mr. Jackson's side because his name keeps popping up in all these messages. Most of the messages they're at wee hours of the morning." She stated: "I've never had prank phone calls, harassing, in the history of me, not even while I worked there."

125.    Ms. Mayers spoke candidly about what she had endured: "I want whoever is doing this to stop...I want there to be a conversation so that there is some kind of understanding to leave me alone. Leave me alone." She stated: "The only thing I'm guilty of is working someplace. That's it. I was fired. I left. I didn't apply for anything. I didn't get any severance. My Forbes article was taken down, and I still was taken out of the way and I'm still having problems to this day."

126.    In response, Judge Crane stated on the record: ***"I mean, this has never happened in any case I've ever had."***

127.    Judge Crane condemned the deposition conduct outright: *"I don't like the line of questioning that Ms. Mayers was subject to at her deposition and I really don't—I wouldn't consider it on summary judgment, and I may strike it because it's totally irrelevant."*

128.   She also treated the threat to Ms. Mayers' safety as immediate and serious: *"In terms of your safety, I'm going to pass all this along to our Court Officers. I've elevated this.... I am not sure who they should call in addition to the U.S. Attorney."* The Assistant United States Attorney on the New Jersey criminal case—Blake Coppotelli—was identified on the record by counsel present at the conference. Multiple parties from the civil litigation confirmed they would forward the relevant materials directly to him.

129.   The next day—on September 17, 2024—the FBI called Ms. Mayers. They asked what was happening and whether she knew why Jackson would want to harass her. The institutional response—a state judge, law enforcement, and the U.S. Attorney's Office all engaged simultaneously—corroborates the severity and credibility of the conduct being reported.

130.   Two days later, Ms. Mayers told her therapist what the experience had been like. ***"I was prepared. I was uncomfortable and nervous at times. When they lied, I got angry. I was crying at times. I was emotional."*** Her therapist noted she remained articulate, reasoned, and calm. She was not exaggerating. She was a woman who had been subjected to years of sustained intimidation—and was still standing.

131.   Unfortunately, even after Ms. Mayers escalated her concerns to a state judge, the harassment would not stop. In December 2024, Ms. Mayers again

contacted Judge Crane and stated plainly that she needed an order of protection because she did not feel safe. By that point, she had reported Jackson to the FBI, filed two police reports, informed a state judge, and sought protection through every available channel.

132. Nothing changed. She was repeatedly directed back to authorities. The harassment continued without interruption.

133. For example, on March 6, 2025, Ms. Mayers received a text message from "Tie Walker," an associate of Jackson. The calls persisted from new numbers. Callers continued to ask for "Curtis."

### *The Anniversary: August 3, 2025*

134. On August 3, 2025—exactly one year after the "bang bang, I shot you down" barrage—Ms. Mayers received fifteen calls from phone number 979-327-9383. The calls began at 12:08 a.m. and continued through 3:16 a.m.

135. The same date: August 3. The same number of calls: fifteen. The same predawn hours: between midnight and dawn. One year apart. The precision was not coincidental. It was a deliberate replication of the prior year's conduct on the exact same date, at the exact same count, within the exact same hours.

136. The anniversary barrage required planning and attention to detail—someone had to remember the date of the first barrage, ensure exactly fifteen calls

45

were placed, and replicate the predawn timing. The message was plain: I remember. I'm watching. I will not stop.

137.   That conduct was Defendant's. The anniversary barrage is consistent with the documented pattern of deliberate, premeditated retaliation that has defined Jackson's conduct toward Ms. Mayers throughout this campaign.

### *Ongoing Harassment — A Campaign That Has Never Stopped*

138.   On November 13, 2025, Ms. Mayers received four calls from two numbers—925-471-2627 (Conrad, California) and +255776351445 (Tanzania). One caller asked to speak to Curtis. When Ms. Mayers called back, two men told her that "50 Cent owed them 100k, for girls they got for him, and he did not pay them. They said he called them from Ms. Mayers' number a year ago." Ms. Mayers told them that was impossible because the number had been hers for years. Their response: "you can do things like that when you have money."

139.   The November 2025 incident was not the last. On March 15, 2026—less than two months before the filing of this Complaint—Ms. Mayers received a text from an unknown number from someone seeking Tony Yayo, Jackson's longtime hype man and G-Unit performer. Ms. Mayers has no relationship with Tony Yayo. She has no reason to receive messages intended for him. She has no connection to him except through Jackson. Whether Jackson personally distributed her number to this individual or whether it reached him through the network of

contacts Jackson has long maintained and deployed against her, the result is the same: Jackson's world was once again forced into Ms. Mayers' life uninvited, unwanted, and without legitimate purpose.

140. Jackson's campaign has now spanned more than six years—from January 2020 through the filing of this Complaint in 2026. It has not paused. It has not responded to any measure Ms. Mayers has taken to stop it—not two police reports, not FBI contact, not a state judge's intervention. Ms. Mayers has documented over eighty-three incidents through November 2025 alone, and the harassment has continued into 2026.

141. Each new call, each new text, each new distribution of Ms. Mayers' phone number is a separate and independently actionable wrong. The voicemail left on April 28, 2026, where the caller stated they were looking for "50" days before the filing of this complaint is the most recent documented act in the series. Taken together, these acts form an unbroken course of retaliatory conduct originating from a single source—Curtis James Jackson III—directed at a single target—Ms. Mayers—for a single reason: she refused to break the law for him and refused to come back when he asked. Ms. Mayers has identified Jackson by name to the FBI, to local law enforcement, and to a sitting State judge. She is prepared to prove it.

47

142. The harassment of Ms. Mayers is not random. It is sustained, deliberate, and executed in a manner designed to ensure she understood who was behind it—and to ensure she understood the consequences of continuing to defy him.

### *The Power Disparity*

143. Jackson is a globally recognized entertainer with significant wealth, substantial resources, and the ability to sustain a campaign of harassment far beyond the capacity of an ordinary person.

144. Jackson also possesses the celebrity to enlist others to act at his direction. He personally distributed Ms. Mayers' phone number to strangers at a public event in San Diego in September 2023, confirmed under oath by Victor Sena. When Jackson gives out a phone number and represents that money is owed, people call. Jackson turned others into instruments of harassment while remaining the architect of the campaign.

145. Jackson used that power against a former employee with no comparable resources, no public platform, and no realistic ability to defend herself in kind. That severe imbalance in power is central to why Jackson's conduct was extreme and outrageous—and why punitive damages are necessary for meaningful accountability.

### *The Severity of the Harm*

146.   Jackson's campaign inflicted severe, sustained, and ongoing emotional distress, documented across multiple independent channels spanning six years. The harm did not begin with the phone calls. It began in March 2019—before Ms. Mayers was even terminated—when the phone records pressure campaign that followed her three refusals caused her to develop elevated blood pressure for the first time in her life. She went to urgent care on March 18, 2019, and was referred to a specialist the following day. Her physician confirmed her pressure was higher on March 19 than the night before and directly asked whether her job was stressful. Ms. Mayers then texted Jackson directly to inform him she had gone to urgent care and might be late for work the following morning. Jackson had actual, contemporaneous knowledge that his conduct was causing her physical harm. He continued the pressure campaign regardless

147.   The physical harm Jackson caused in 2019 was only the beginning. When the campaign escalated to its most threatening acts five years later, Ms. Mayers sought mental health treatment for the first time in her life—presenting in August 2024 with overwhelming anxiety, what her therapist documented as the ongoing burden of deflecting harassing phone calls from people in Jackson's orbit. She had no prior mental health history. The harm was new because he had created it.

49

148. The termination that followed was retaliatory. Jackson fired Ms. Mayers on March 27, 2019, three months after the $168,000 wire he later claimed was unauthorized, and immediately after she refused, on the same day, to file a false police report to conceal his undisclosed cash from the bankruptcy court and to fire Walters while Jackson listened in secret. The timeline itself disproves any legitimate basis for termination.

149. The documented harm includes: elevated blood pressure requiring urgent medical care and specialist referral, the onset of which Ms. Mayers contemporaneously communicated to Jackson; loss of professional income and career advancement caused by Jackson's Forbes suppression, refusal to provide references, the circulation of a false termination narrative, and the industry-wide chilling effect on prospective employers who are aware of Jackson's pattern of retaliating against those he views as disloyal; the cost of legal counsel retained twice in connection with legal proceedings arising from Jackson's own business disputes, without any compensation; and years of pervasive fear, loss of enjoyment of life, and the ongoing inability to secure employment commensurate with her experience, as a direct result of the emotional and psychological harm inflicted by Defendant's conduct.

150. This is not isolated harm. It is not temporary. It is a continuing campaign. Jackson did not target a stranger. He targeted a woman who, for twelve

50

years, had executed his directives without question—and who, for three days in early 2019, finally said no.

151. That harm is documented not only in police reports and court transcripts, but in clinical records. From her first session in August 2024—when her therapist noted she was anxious, overwhelmed, and fielding calls from strangers connected to Jackson—to October 2024, when that same therapist recorded that Ms. Mayers was crying, distressed, and frightened, and formally flagged safety concerns arising from nighttime calls and a triggered home alarm, the clinical record tracks what Jackson did to her in real time. The records span months. The harm they document spans years. Jackson created both.

## **FIRST CLAIM FOR RELIEF AGAINST DEFENDANT**
### *(Intentional Infliction of Emotional Distress in Violation of Georgia State Law)*

152. Plaintiff repeats and realleges each and every allegation set forth in the above paragraphs as if fully set forth herein.

153. 152. Georgia law recognizes a cause of action for intentional infliction of emotional distress where a defendant's conduct is: (1) intentional or reckless; (2) extreme and outrageous; (3) causally connected to the plaintiff's distress; and (4) results in severe emotional distress. Each element is fully established here. This claim accrues as a continuing violation: because Defendant's tortious conduct has never ceased, a fresh cause of action arises with each new act of harassment. The

51

most recent documented act occurred on March 15, 2026, within the limitations period applicable to this claim. Under the continuing violation doctrine, the entire course of conduct is actionable. In the alternative, the acts occurring within the two-year period preceding filing are each independently actionable, and the full pattern is admissible as evidence of those timely acts.

154.153.     Defendant acted intentionally. Jackson was personally present on Zoom, silently watching, when his attorney asked Ms. Mayers whether she knew who murdered Israel Ramirez. Jackson personally directed the pre-deposition threats—the "you will suffer fif" text arrived using his own nickname within twenty-four hours of his counsel learning of Ms. Mayers' unaccounted-for testimony. Jackson personally listened on mute during multiple calls through his attorney in the weeks before her termination—a technique confirmed by Savva himself. Jackson personally distributed Ms. Mayers' phone number at a public event in San Diego, confirmed under oath by Victor Sena. Jackson sent George Bishop to Ms. Mayers' home. The August 3, 2025, anniversary barrage—fifteen calls, same date, same predawn hours, one year to the day after the original barrage—required deliberate coordination. Defendant also acted recklessly at a minimum: he had actual, contemporaneous notice—via Ms. Mayers' own text on March 18, 2019—that his conduct was causing her physical harm. He continued regardless. All acts of Defendant's agents—O'Kelly, Rafferty, Bishop, and the third parties to whom

Jackson distributed Ms. Mayers' phone number—are attributable to Defendant as they were performed at Jackson's direction and under his control.

155.154.    Defendant's conduct was extreme and outrageous—so extreme in degree as to go beyond all possible bounds of decency and to be utterly intolerable in a civilized community. The following acts, individually and in combination, establish this standard. Plaintiff does not assert that the acts of Defendant's counsel at the May 2024 deposition are independently actionable as attorney conduct; rather, Plaintiff alleges that Defendant Jackson directed and orchestrated the use of the deposition as an instrument of witness intimidation, and that Jackson's direction, authorization, and personal presence during that conduct renders it attributable to and actionable against Jackson himself:

> a.    Jackson's campaign included the worst forms of intimidation: a threat that Ms. Mayers would "suffer fif" the night before her court-ordered deposition; fifteen pre-dawn calls with voicemails singing "bang bang, I shot you down" on August 3, 2024, repeated exactly one year later; and deposition questions about the unsolved murder of Israel Ramirez, a topic with no relevance to the case, no connection to Ms. Mayers, and no purpose except intimidation. Jackson also used his investigator to threaten that "if we want your families phone numbers, we can get them," distributed Ms. Mayers'

53

personal number to strangers, killed a Forbes profile with false embellishment accusations. The campaign began after Ms. Mayers refused Jackson's demands, continued after she rejected George Bishop's attempt to bring her back into Jackson's orbit, and escalated each time Jackson perceived her cooperation with law enforcement or the courts as a threat. The causal chain is documented across six years in police reports, sworn testimony, medical records, FBI contact, and a state court transcript.

156.155.    There is direct, unbroken causation between Defendant's conduct and Plaintiff's harm. The physical onset began on March 18, 2019—during the phone records pressure campaign that followed directly from Ms. Mayers' three refusals. Ms. Mayers texted Jackson directly to notify him she had gone to urgent care, giving him actual contemporaneous notice that his conduct was causing physical harm. He continued. The campaign then escalated continuously through the 2021 grand jury subpoena, the May 2024 deposition, the August 2024 barrage, the August 2025 anniversary replication, and the March 2026 contact. Each escalation corresponds precisely to a moment when Jackson perceived a threat from Ms. Mayers' cooperation with legal proceedings or her refusal to submit to his demands. The causal chain is documented in real time across six years—in police reports, sworn testimony, medical records, FBI contact, and a state court transcript.

157.156.    As a direct and proximate result of Defendant's intentional acts described herein, Plaintiff has suffered severe emotional and psychological injuries—including physical manifestation in the form of elevated blood pressure requiring urgent care and specialist referral, the onset of which was contemporaneously communicated to Defendant; mental anguish, humiliation, emotional distress, loss of enjoyment of life, inability to secure employment commensurate with her nearly twelve years of experience, and other non-pecuniary losses. Ms. Mayers has filed two police reports, contacted the FBI out of fear for herself and her family, sought a court order of protection, and reported the conduct to a sitting State judge—who described it as unprecedented in her courtroom, elevated it to Court Officers, and referred it to the U.S. Attorney's Office. Due to the traumatic nature of the events and the injuries she has suffered, the harm is ongoing. Each new act of harassment causes new and additional injury. Plaintiff has been diagnosed with adjustment disorder with anxiety.

158.157.    Defendant engaged in extreme and outrageous conduct and acted maliciously and with specific intent to harm Plaintiff by intimidating a State witness, punishing a former employee for refusing to commit fraud, and sustaining a six-year—and continuing—campaign of intimidation through threats, harassment, deposition misconduct, and the deliberate weaponization of his wealth, celebrity,

and access to third parties. Defendant acted intentionally and with reckless disregard

for the consequences of his actions and omissions and continues to do so.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANT
### *(Invasion of Privacy by Intrusion Upon Seclusion)*

159.   Plaintiff repeats and realleges each and every allegation set forth in the above paragraphs as if fully set forth herein.

160.158.    Plaintiff asserts violations of Georgia law relative to intentional torts by Defendant.

161.159.    Plaintiff has a recognized and fundamental right of privacy. *Pavesich v. New Eng. Life Ins. Co.*, 50 S.E. 68 (Ga. 1905).

162.160.    The right of privacy includes the right of an individual "to be let alone." *Pavesich v. New Eng. Life Ins. Co.*, 50 S.E. 68 (Ga. 1905).

163.161.    The State of Georgia recognizes the tort of Intrusion into Seclusion, and has adopted the Restatement (Second) of Torts, which provides: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (1977).

164.162.    This claim accrues as a continuing violation. Defendant's intrusions upon Plaintiff's seclusion have been unbroken and ongoing from January

2020 through the filing of this Complaint. The most recent documented intrusion occurred on or about April 28, 2026—within the limitations period applicable to this claim. Each individual intrusion is a separate, independently actionable wrong. Under the continuing violation doctrine, the entire course of intrusive conduct is actionable. In the alternative, the intrusions occurring within the two-year period preceding filing are each independently actionable, and the full pattern is admissible as evidence of those timely acts.

165.163.    Defendant has intruded upon the privacy rights of Plaintiff and violated Plaintiff's right to maintain seclusion and solitude by orchestrating a campaign of severe and persistent intrusion targeting Plaintiff over more than six years—over eighty-three documented incidents involving at least twenty-five unique phone numbers, with the harassment occurring at all hours of the day and night. Each individual intrusion is a separate wrong. Together, they constitute a continuing violation that remains active and ongoing as of the date of filing.

166.164.    Defendant's distribution of Plaintiff's phone number to random strangers—confirmed under oath by Victor Sena, who testified that Jackson personally gave him Ms. Mayers' number at a public event in San Diego—with instructions or inducements to call and text Plaintiff at all hours of the night and morning, is offensive and objectionable to a reasonable person and constituted a significant and unjustified intrusion into Plaintiff's privacy.

57

167.165.    Among the many calls and messages Plaintiff received, she also received explicit threats: the text "you will suffer fif" the night before her deposition, and voicemails singing "bang bang, I shot you down" delivered fifteen times beginning at 4:29 a.m. on August 3, 2024, and replicated with identical precision on August 3, 2025. These intrusions were delivered into the most private hours of Ms. Mayers' day, by a person of extraordinary power and resources, and caused severe emotional distress.

168.166.    Plaintiff had a reasonable expectation of privacy in her solitude, seclusion, private concerns, and affairs. Ms. Mayers is a private individual. She is not a public figure. She did not invite public attention. She sought only to rebuild her professional life after nearly twelve years of service. Jackson's campaign has denied her that expectation for over six years.

169.167.    The conduct of Defendant and his agents resulted in multiple intrusions and invasions of privacy that would be highly offensive to a reasonable person. The coordinated October 29, 2024, cluster—eight calls from four different phone numbers across four states within forty-two minutes—and the anniversary replication of August 3, 2025, demonstrate that the intrusions were not incidental but systematically planned, coordinated, and executed over an extended and continuing period.

58

170.168.　　Defendant's distribution of Plaintiff's phone number and the resulting campaign of calls and messages was repeated with such persistence and frequency as to amount to a sustained course of hounding Plaintiff—constituting a substantial and ongoing burden on her existence. As Ms. Mayers testified under oath, she has been unable to disclose where she currently works out of fear of being located and targeted again.

171.169.　　Defendant's intrusions into Plaintiff's seclusion were substantial and would be highly offensive to a reasonable person, constituting an egregious breach of social norms. Judge Melissa Crane—described the overall conduct as unprecedented in her courtroom, elevated the matter to Court Officers, and referred it to the U.S. Attorney's Office. That institutional response corroborates that the conduct exceeded all ordinary bounds.

172.170.　　Defendant's calculated actions have caused Plaintiff to reasonably fear for her life, her safety, and the safety of her family. Defendant's private investigator's explicit threat—"if we want your families phone numbers, we can get them"—establishes that the intrusion was not limited to Ms. Mayers alone but extended to her entire household.

173.171.　　Defendant's meticulous, coordinated, and menacing campaign directly and proximately caused, and continues to cause, Plaintiff significant emotional and psychological injuries—including mental anguish, humiliation,

59

emotional distress, loss of enjoyment of life, and other non-pecuniary losses. The harm caused by the invasion of Plaintiff's privacy is ongoing. As of the filing of this Complaint, it has not stopped. As a result of such intrusions and invasions of privacy, Plaintiff is entitled to actual and punitive damages from Defendant in an amount to be determined at trial.

**DEMAND FOR A JURY TRIAL**

174.172.      Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Monique Mayers respectfully demands judgment against Defendant Curtis James Jackson III as follows:

**I. On the First Claim for Relief (Intentional Infliction of Emotional Distress)**

a. Compensatory damages in an amount to be determined at trial for all injuries directly and proximately caused by Defendant's intentional conduct, including:

> i. Past, present, and future severe emotional distress, mental anguish, fear, and psychological trauma resulting from Defendant's six-year—and continuing—campaign of harassment, intimidation, and witness retaliation, including the receipt of gun-violence voicemails in the predawn hours of August 3, 2024, their deliberate replication on August

60

3, 2025, the use of a court-ordered deposition to invoke an unsolved murder as a threat to a State witness, and each subsequent act of harassment through the filing of this Complaint;

ii. Physical injury, including the onset of high blood pressure requiring urgent care and specialist referral, first manifesting in March 2019 as a direct and documented result of Defendant's pressure campaign, and any ongoing or future physical harm causally connected to Defendant's conduct;

iii. Economic harm, including lost earnings, lost business opportunities, and lost professional advancement proximately caused by Defendant's suppression of Plaintiff's Forbes profile through knowingly false embellishment allegations, Defendant's refusal to provide employment references after nearly twelve years of service, Defendant's fabricated termination narrative first advanced at the May 2024 deposition, and the resulting chilling effect on prospective employers in the entertainment industry—all of which constitute ongoing and continuing harm through the date of filing;

iv. The cost of legal counsel Plaintiff was required to retain and pay on two separate occasions in connection with legal proceedings arising

61

from Defendant's own business disputes, without ever receiving the severance Defendant promised on the termination call and never paid;

v. Loss of enjoyment of life, including Plaintiff's inability to disclose her place of employment, her need to conceal her professional activities out of ongoing fear of being located and targeted, and the pervasive and unrelenting disruption to her daily life, sleep, and sense of personal safety; and

vi. The cost of the emotional and psychological injuries inflicted by Defendant's conduct.

b. Punitive damages in an amount sufficient to punish Defendant and deter him and others of comparable wealth, celebrity, and influence from engaging in similar conduct. Punitive damages are warranted because Defendant's conduct was not impulsive, inadvertent, or negligent—it was deliberate, sustained, premeditated, and escalating over six years and continuing. Specific grounds include:

i. Defendant personally directed his attorney to question a State witness about an unsolved murder at a court-ordered deposition while personally watching on Zoom—conduct so extreme that the presiding State judge described it as unprecedented in her courtroom and stated she may strike it entirely as totally irrelevant;

62

ii. Defendant caused a threatening text using his own well-known nickname to be sent to Plaintiff less than twenty-four hours after his counsel discovered she had given unaccounted-for testimony, and the night before her court-ordered deposition—a threat confirmed on the record before testimony even began;

iii. Defendant arranged for fifteen predawn calls with gun-violence voicemails on August 3, 2024, and then deliberately replicated the same conduct—same date, same count, same predawn hours—exactly one year later on August 3, 2025, demonstrating a level of premeditation and calculation that eliminates any claim of impulsive behavior;

iv. Defendant's private investigator threatened Plaintiff that "if we want your families phone numbers, we can get them"—a threat extending Defendant's campaign of intimidation to Plaintiff's family members;

v. Despite Plaintiff reporting Defendant's conduct to the FBI, to the Sheriff's Office on two separate occasions, to a sitting State judge, and seeking a court order of protection, Defendant has shown no remorse, and the harassment has continued without interruption through the filing of this Complaint; and

vi. Defendant commands extraordinary wealth, global celebrity, and influence—resources he has deliberately wielded against a former

employee who had no comparable means to defend herself. The power disparity between the parties is itself a ground for enhanced punitive damages, as ordinary compensatory damages would impose no meaningful deterrence on a defendant of Defendant's resources.

## II. On the Second Claim for Relief (Invasion of Privacy by Intrusion Upon Seclusion)

c. Compensatory damages in an amount to be determined at trial for all injuries directly and proximately caused by Defendant's deliberate and sustained intrusion upon Plaintiff's privacy and seclusion, including the harm caused by at least eighty-three documented incidents of unsolicited contact across at least twenty-five unique phone numbers over a period of more than six years, the coordinated multi-state calling clusters, the distribution of Plaintiff's phone number through entertainment industry channels and social media platforms, and the continuing receipt of unwanted contact that persisted through at least March 15, 2026—the date of the most recent documented intrusion—and was ongoing at the time of filing.

d. Punitive damages on the invasion of privacy claim in an amount sufficient to punish Defendant for the deliberate, calculated, and sustained nature of his intrusion upon Plaintiff's seclusion. Punitive damages are independently warranted because the distribution of Plaintiff's phone number was not incidental or accidental—it was personally executed by Defendant at a public event, confirmed

under oath by an eyewitness, deliberately repeated across years and multiple channels, and employed as a mechanism to enlist third parties as instruments of harassment at Defendant's direction and under his control.

## III. Relief Applicable to Both Claims

e. A permanent injunction enjoining Defendant, his agents, employees, attorneys, and all persons acting in concert with him from:

i. Contacting, calling, texting, or communicating with Plaintiff by any means, directly or through third parties;

ii. Distributing, disclosing, or sharing Plaintiff's personal phone number, address, place of employment, or any other personal identifying information to any third party; and

iii. Taking any action designed to intimidate, harass, or retaliate against Plaintiff in connection with any past, present, or future testimony or cooperation with any law enforcement or judicial proceeding;

f. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

g. Reasonable attorneys' fees and expenses of litigation to the extent permitted by applicable law;

h. Costs of suit; and

i. Such other and further relief as this Court deems just and proper.

## CERTIFICATION OF COUNSEL

I hereby certify that the foregoing **COMPLAINT AND DEMAND FOR JURY TRIAL** has been prepared with Times New Roman, 14-point font, one of the fonts and point selections approved by the Court in LR 5.1(C).

Dated:

Respectfully submitted,

By: _____

JEREMY STEPHENS
191 Peachtree St NE, Ste 4200,
Atlanta, GA 30303
P: (404) 965-1682
F: (470) 639-6866
JStephens@forthepeople.com
GA BAR #: 702063
*Attorneys for Plaintiff*